Birch Ranch & Oil Company v. Commissioner.
Birch Ranch & Oil Co. v. Commissioner
Docket No. 64284.
United States Tax Court
T.C. Memo 1960-225; 1960 Tax Ct. Memo LEXIS 65; 19 T.C.M. (CCH) 1258; T.C.M. (RIA) 60225; October 24, 1960
*65 Held, that petitioner made certain loans to a partnership and, when that partnership was incorporated, accepted preferred stock with no ascertainable fair market value in full satisfaction of these loans, which stock became worthless during petitioner's fiscal year ended September 30, 1952, entitling petitioner to a capital loss deduction in amount of the loans. William P. Camusi, Esq., and Clyde C. Shoemaker, Esq., 1207 West 9th Street, Los Angeles, Calif., for the petitioner. Earl C. Crouter, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency in the income tax of petitioner of $112,313.03 for its fiscal year ended September 30, 1952. The issue now before us is whether petitioner sustained a capital loss in said year due to the worthlessness of certain preferred stock, and, if so, the amount of said loss. Findings of Fact Some of the facts have been stipulated and they are so found. Petitioner, Birch Ranch & Oil Co., was incorporated under the laws of the State of Nevada in 1934 and has been engaged in extensive and diversified activities since that time, its two largest *66 assets being oilproducing real property in Orange County, California, and a ranch consisting of approximately 22,000 acres in Yolo County, California. At all times mentioned herein, petitioner has kept its books on a cash basis and a fiscal year ended September 30. Petitioner filed its Federal income tax return for the year before us with the director of internal revenue at Los Angeles, California. On March 13, 1944, a mining partnership, known as Metal Producers and hereinafter referred to as the partnership, was formed under the limited partnership laws of the State of Utah for the purpose of reworking the old "Horn Silver Mine" located some 16 miles west of the town of Milford, Utah. The general partners were George W. Clemson, A. E. Kipps, and R. R. Landrum (hereinafter referred to as Clemson, Kipps and Landrum, respectively), and petitioner was a limited partner. The partnership was advised that a corporation could not be a member of such a partnership and petitioner therefore withdrew. On December 30, 1944, an amended certificate of partnership was filed and A. Otis Birch, who, with his wife are, and were then, the sole stockholders of petitioner, became a limited partner *67 of the partnership in place of petitioner. (Hereinafter, A. Otis Birch and his wife are referred to as Otis and Estelle, respectively.) Petitioner had invested $60,000 in the partnership up to that time, and Otis repaid said sum to petitioner. The amended certificate stated that Otis had contributed $60,000 and was to contribute an additional $60,000 by April 1, 1945. On December 15, 1945, a second amended certificate was filed, which certificate reveals that the membership of the partnership was changed as follows: General partners on that date were Otis, Lula M. Minter (hereinafter referred to as Minter), Clemson and Landrum; the limited partners were Otis and Minter. The second amended certificate states that Minter contributed as a limited partner the sum of $12,000. An agreement of the same date, December 15, 1945, between the four general partners, set forth their interest as follows: Otis
50 per cent
Minter
10 per cent
Clemson
25 per cent
Landrum
15 per cent
There followed an amendment to the second amended certificate of partnership, dated October 1, 1949, and an agreement concurrent therewith, the only effect of which was to add Estelle as a general *68 partner, and the 50 per cent interest of Otis was divided equally between them. The partnership started development of the Horn Silver Mine, which it held under lease, in April 1944 and normal operations began in December 1945. Said operations consisted largely of the production of selected ores of sufficient value to justify shipment to a smelter. Following World War II, the market price for such ores decreased below the point which would allow petitioner to continue such an operation on a profitable basis, and petitioner began to erect a mill, capable of treating the ore as mined, in order to convert it into concentrates of sufficient value to justify shipment at a profit. At one point, prior to 1950, the price of lead and zinc, which were the principal metals derived, got so low that it ceased operations at this mine altogether and the partnership turned to exploring for copper. During this period, which lasted about 2 years and terminated prior to the end of 1950, the partnership actually mined some copper on land leased from the O.K. Mine. During the years 1944 through December 15, 1950, certain monies were received by the mining partnership, in its operations, from Otis, *69 Clemson, petitioner and Minter, as follows: Loaned By
Loaned To
Period
Amount
Otis
Partnership
1944 and 1945
$120,000.00
Petitioner
Partnership
1945 through 1950
822,600.00
Clemson
Partnership
1945 through 1950
107,087.31
Minter
Partnership
1945
12,000.00
The amounts received from the petitioner were evidenced by demand promissory notes, each bearing 5 per cent interest (save one note dated December 15, 1950, for $3,600 bearing 2 per cent interest). By years these loans from petitioner to partnership totaled: Year
Amount
1945
$ 85,500
1946
65,500
1947
68,250
1948
363,350
1949
163,500
1950
76,500
None of the interest called for by these notes was ever paid. The partnership's Federal income tax return for the calendar year 1950 reflected partners' capital accounts, in the red, at the end of that year as follows: Otis
$257,206.80
Estelle
43,658.89
Clemson
177,145.80
Minter
66,255.44
Landrum
106,287.41
The partnership did not have net profits in any year but its potential and prospects for success were always present. In its Federal and state tax returns, it reported losses, distributable, *70 in part, to Otis and Estelle, as follows: Year
Partnership
Otis
Estelle
1944
No Production
1945
$ 24,942.23
$ 12,471.11
1946
155,708.06
77,854.03
1947
60,713.71
30,356.86
1948
204,299.47
102,149.73
1949 *
117,704.74
51,495.82
$ 7,356.54
1950
145,209.39
36,302.35
36,302.35
In the fall of 1950, the prices of lead and zinc were rising because of the Korean conflict. Under date of October 20, 1950, Clemson sent a letter to the members of the partnership in which he stated, in part, the following: The mill is now completed and present market conditions indicate that the demand for metals and market prices are increasing, and it appears that stock pile buying may soon be in force on copper and zinc. In March of this year we also acquired a lease on a copper deposit in Beaver County and in June we commenced running dumps and exploring. We have now developed a large body of mill ore and will seek a government contract for two years run on a profitable basis. In view of present conditions and of the fact that we now have milling facilities available to treat ore as mined, which ore is also available *71 in considerable quantity, it is my firm belief that we can look forward to operations on a substantial profitable basis for a considerable period of time to come, and this without taking into account the large quantity of zinc ore in the Horn mine. However, I am not discounting the possibility that in the not too distant future we may be able to make very large profits from our zinc ores alone, by the use of a smelting process which I understand will soon be placed on the market by the American Cyanamid Company, which process is designed to affect recovery of metal at the mill site. From the information I have obtained it appears that this process has considerable merit. In my opinion our present setup has reached the state of development that in light of all indications and potentialities it is entirely reasonable to expect very substantial profits to accrue from the operations of our holdings; however, the partnership agreements specify a term of fifteen years from March 13, 1944, the date of organization thereof, but is nevertheless subject to sooner termination under contingencies therein provided. I am, therefore, concerned as to the soundness of the present partnership form *72 of business relationship, and particularly as to what effect it may have upon dealings with governmental agencies, because of the uncertainties and ever present possibility that the partnership may be terminated and thus cause to the various partners in interest losses generally attendant upon such termination and which would undo much that has been and may hereafter be accomplished toward the substantial establishment of a long-time profitable operation. Largely as a result of Clemson's advice, the partnership was succeeded by Metal Producers, Inc., hereinafter referred to as the corporation, which was organized in the State of Nevada on November 20, 1950, and authorized to do business in the State of Utah on December 27, 1950. The authorized capital structure of the said corporation was 1,000 shares of preferred stock with a par value of $1,000 per share, and 1,000 shares on common stock with a par value of $1 per share. On December 15, 1950, all the assets of the partnership, which consisted of mining equipment, the mill built during the partnership period, mill equipment and a leasehold interest in the Horn Silver Mine, were transferred and assigned to the said corporation *73 and the corporation assumed all of the indebtedness of the partnership. At the same time, 1,000 shares of common stock of the corporation were issued to the following persons in the amounts herein indicated: Otis
250 shares
Estelle
250 shares
Minter
100 shares
Clemson
250 shares
Landrum
150 shares
Also, at the same time, the corporation issued to petitioner 814 shares of preferred stock totaling $814,000 par value, and two promissory demand notes, one in the sum of $3,600, and one in the sum of $527.33. The minutes of the board of directors of the corporation, dated December 15, 1950, and hereinafter referred to as the December 15, 1950 minutes, reflect that said stock and the two said notes were issued to petitioner in exchange for monies advanced by petitioner to the partnership in the sum of $814,527.33 between 1945 and November 30, 1950, and for an additional loan of $3,600 made by petitioner between November 30, 1950, and December 15, 1950. On the same date, the corporation issued to Clemson 98 shares of preferred stock, with a total par value of $98,000, and two demand promissory notes in the amount of $812.31 and $2,400, respectively. The December 15, 1950, minutes *74 reflect that said preferred stock and promissory notes were issued to Clemson in exchange for monies loaned by Clemson to the partnership in the sum of $98,812.31 up to November 30, 1950, and for additional monies loaned in the sum of $2,400 between November 30, 1950, and December 15, 1950. Also, the December 15, 1950, minutes reflect that, on December 15, 1950, Otis and Minter were, respectively, owed by the partnership the sums of $53,425.87 and $4,602.89, which amounts represented the balance unpaid to them of their original investment as limited partners, which original investments were stated to be $120,000 and $12,000, respectively. In consideration of their releasing the partnership from said obligation, the corporation agreed to pay said sums, without interest, to said individuals, at the rate of $1 per ton for ore mined, produced, and sold, the $1 to be divided between them in proportion to the respective obligations owing to them. If not so paid, they were to be paid on distribution of the assets as general creditors, but only after other general creditors had been paid. (This agreement for payment was identical to the agreement Otis and Minter, as limited partners, had *75 with the partnership, except the partnership agreement provided for repayment at the rate of $2 per ton rather than $1 per ton.) At the same meeting, the corporation issued to Otis a demand promissory note in the sum of $15,000, which the minutes state was in consideration for an additional sum in that amount loaned by him to the partnership. The December 15, 1950, minutes reflect the balance sheet of the partnership as of November 30, 1950, which is considered as follows: Assets
Total current assets consisting of cash, service deposits equipment
and mill supplies, mill site, and accounts receivable
$ 13,451.31
Mine equipment and other assets
$105,120.24
Less depreciation
45,870.58
59,249.66
Mill-buildings, machinery and equipment
$162,303.95
Less depreciation
34,426.28
127,877.67
Mine development costs
$269,317.26
Less depletion
174,940.61
Remainder
94,376.65
Mine leaseholds
Leasehold right in Horn Silver Mine and O. K. Copper Mine
825,000.00
Total assets
$1,119,955.29
Liabilities [1]
Notes payable current: Otis
$ 15,000.00
D. C. Peacock
1,000.00
Contingent liability to limited partners: Otis
53,425.87
Minter
4,602.89
payable out of ore mined and sold.
Accounts payable current: Misc. payroll taxes
323.67
Accrued payroll
1,414.75
Sundry accounts
9,470.53
Contract purchases (Bal. due on Ball mill)
3,666.68
Reserve for insurance deduction
62.80
$ 88,967.19
Other liabilities: Notes payable Birch Ranch & Oil [2]
814,527.33
Notes payable Geo. W. Clemson [2]
98,812.31
913,339.64
Net value assigned to general partner's interest
117,648.46
Total liabilities
$1,119,955.29
*76 The partnership's notes payable to petitioner had never been worthless, and had value when they were exchanged for corporation's preferred stock on December 15, 1950. After the corporation was formed, Clemson spent a lot of time in Washington, D.C., trying to obtain for it a contract with the United States Government for the purchase of the corporation's product at a guaranteed price, which would have allowed the corporation to operate at a profit. Clemson was not successful in this endeavor, and the Government stopped entering into such contracts during 1951. The ore available to the corporation in the Horn Silver Mine consisted of about 750,000 tons of stope fill, i.e., lean ore that had been left in the mine from prior operations. Both lead and zinc were *77 found in this ore, and, in order to operate at a profit, both minerals had to be recovered from it at the corporation's mill. Since said mill could only handle lead when the corporation took it over in December 1950, extensive modification of the mill was needed, and this took place mostly during 1951 and the winter of 1952. In the spring of 1952 the necessary changes in the mill had been accomplished, a crew had been hired, and some of them trained to run the mill. The corporation started actual operations at the Horn Silver Mine in March or April of 1952. The market prices at that time for lead and zinc were 19 and 19 1/2 cents per pound, respectively. At these price levels, petitioner was able to derive a profit. During June of 1952, the prices of lead and zinc dropped sharply. The average weekly prices during the first half of 1952 were as follows: Lead Cts.
Zinc Cts.
per Pound
per Pound
January 2
19.00
19.50
9
19.00
19.50
16
19.00
19.50
23
19.00
19.50
30
19.00
19.50
February 6
19.00
19.50
13
19.00
19.50
20
19.00
19.50
27
19.00
19.50
March 5
19.00
19.50
12
19.00
19.50
19
19.00
19.50
26
19.00
19.50
April 2
19.00
19.50
9
19.00
19.50
16
19.00
19.50
23
19.00
19.50
30
18.67
19.50
May 7
17.17
19.50
14
16.00
19.50
21
15.00
19.50
28
15.00
19.50
June 4
15.00
18.30
11
15.00
16.00
18
15.00
15.83
25
15.00
15.00
*78 Prices for these metals remained low. By the end of 1952 they were 14.50 cents and 12.50 cents, respectively, and yearly average prices thereafter were: 1953
13.49
10.85
1954
14.05
10.68
1955
15.14
12.30
The corporation could not operate profitably at the price levels of June 1952, and its management and its stockholders believed that the price decline would be permanent, and that therefore the potential of the Horn Silver Mine had been exhausted. By June 1952, the corporation's leasehold rights were of no value. They had previously been carried on its books at a value of $825,000. At that same time the corporation had debts and accounts payable which exceeded the fair market value of its other assets by approximately 100 per cent. These debts and accounts payable totaled about $400,000 and included loans of $337,451.43 as follows: Birch Ranch & Oil Co., Notes
Payable
$179,777.33
George W. Clemson, Notes
Payable
83,145.64
A. Otis Birch
53,425.57
A. Otis Birch
15,000.00
Lula M. Minter
4,602.89
D. C. Peacock
1,500.00
Total
$337,451.43
In June 1952, the corporation had preferred stock issued and outstanding, 814 shares *79 to petitioner and 98 shares to Clemson. A special meeting of the corporation's board of directors (Clemson, Otis and Landrum) was held on June 20, 1952. The minutes of said meeting state, in part: Mr. Clemson then further stated: That viewing everything from a realistic standpoint, he was forced to the conclusion that to continue operations would only result in further losses; he therefore believed that the company should discontinue operations and should liquidate its assets and dissolve; that he could see no way by which the stockholders of the common and preferred stock would ever realize anything and he was cognizant of the losses that would be suffered by himself and the other stockholders on their stock holdings; that it was his belief that all concerned should face up to the existing actuality, that a liquidation of assets when converted into cash would probably produce only enough to pay off all general creditors, the amounts due to Mr. Birch and to Lula M. Minter under their contract with the corporation, and pay something on the note indebtedness to himself, Mr. Birch and Birch Ranch & Oil Co. * * *
Mr. Birch then stated that he concurred with Mr. Clemson's opinion *80 that nothing could be realized for the mining leases held by the corporation and that he was reconciled to the fact that nothing could be realized by the corporation's stockholders. * * *
Thereupon, upon motion duly made, seconded and carried, the following resolution was adopted: RESOLVED, that this corporation, METAL PRODUCERS, INC., shall and does hereby elect to discontinue business when and as the ore presently in the mill is processed and shipped, which it is estimated can be accomplished within the next two weeks, or so, at which time the employment of the employees at the mine and mill shall be terminated, except that a watchman shall be employed and placed on said property pending liquidation; that thereupon the Secretary of this corporation shall be, and he is hereby authorized and directed to sell the mining and miscellaneous equipment, trucks, etc., other than what is a part of the mill, at such prices as he or other officers shall deem to be the best and highest price obtainable; that the President or Secretary shall be and is also hereby authorized and directed to endeavor to sell the mill, as a whole, at and for a fixed price of not less than $350,000.00, provided *81 however that when said officers in their sole opinion shall determine that said mill cannot be sold as a whole, then the Secretary shall be and is hereby authorized to sell the mill piecemeal at such prices as he shall deem to be the best and highest prices obtainable; and * * *
BE IT FURTHER RESOLVED, that this corporation shall and does also elect to dissolve, and when assets shall have been liquidated and the proceeds therefrom disbursed as above provided, that the officers shall thereupon proceed to take such steps as are required for the formal dissolution of the corporation. On motion duly made, seconded and carried, a further Resolution was adopted, as follows: RESOLVED, that immediately upon termination of employment of the employe s on the mining lease and at the mill, the Secretary shall then effect termination of contracts on account of which the corporation has made any prepaid deposits, in order to obtain refunds to the corporation of any such prepaid deposits. The directors discussed the fact that the corporation did not have sufficient funds on hand to meet the obligations of general creditors, payroll, taxes and other expenses. Clemson expressed his opinion *82 that nothing could be realized from the mining properties held by the corporation under lease and option, the equipment could be sold for a sizable amount at or in excess of the depreciated value, and that he had an offer of $150,000 for the mill. Otis thought more could be realized from the corporation's assets and he wanted to sell them piecemeal. Clemson told Otis to go ahead with his idea, but as far as he was concerned, he was through with the corporation. Thereupon Clemson abandoned all ties with the corporation and waived his right to recover on the corporation's notes and preferred stock which he held. The funds needed by the corporation to stave off bankruptcy, while its assets were liquidated, were loaned to it by petitioner in the hope of increased recoupment. Immediately after this special meeting, the corporation ceased all operations and from that time forward proceeded in an orderly manner to dismantle and sell its equipment and machinery. By September 30, much of the corporation's machinery had been sold and most of its mining equipment was no longer intact. The disposal of the corporation's assets was also actively carried on during 1953 and 1954, and it was finally *83 dissolved in 1955, the following amounts having been realized: Cash Sales
$ 36,073.42
Sales on Open Account to
Turtle Mountain Mining
Co.
34,317.30
Sale to Petitioner for Credit
on Notes Payable
42,765.06
$113,155.78
As of June 20, 1952, the corporation was, and was known to be insolvent. It could not meet its current obligations and its liabilities exceeded its assets. The corporation's leasehold interests were valueless and the stockholders of the corporation abandoned all hope of operating them on a profitable basis. Petitioner and its stockholders were separate and distinct entities, and the funds advanced by petitioner to the partnership between 1945 and December 15, 1950, constituted loans. The petitioner canceled $814,000 of said loans in exchange for 814 $1,000 par value preferred shares of the corporation's stock on December 15, 1950, at which time such stock had no ascertainable fair market value, but did have intrinsic or potential value. Said stock became worthless during petitioner's fiscal year ended September 30, 1952. Opinion The issue is whether petitioner sustained a capital loss during its fiscal year ended September 30, 1952, and, *84 if so, the amount of such loss. This is dependent upon whether the preferred stock of the corporation became worthless in such year and the basis for such stock in petitioner's hands. These are fact questions which must be decided upon the evidence as developed in the record before us. We are aware of the fact, as laboriously urged by respondent, that if petitioner prevails here, it will have gained a deduction because of worthlessness of corporation's stock while petitioner's sole stockholders, Otis and Estelle, have already deducted their proportionate share of the partnership's yearly deficits prior to its incorporation. Respondent would have us treat petitioner and its stockholders as one economic unit, but the record in this case establishes, and we have so found, that petitioner and its stockholders were separate and distinct entities. We find no merit in respondent's contention that Otis "was the alter ego of the petitioner." Respondent has stipulated, and we are satisfied that petitioner "has been engaged in extensive and diversified activities since its inception," and investment in a mining venture was not foreign to its prior character. It is well settled that, in order *85 for a taxpayer to deduct a loss due to the worthlessness of capital stock, there must have occurred some identifiable event by which such loss is clearly evidenced, and such an event may be the decision of an insolvent corporation to dissolve. (C.A. 2, 1934), affirming per curiam a (C.A. 8, 1954), reversing on other grounds a Memorandum Opinion of this Court. In the latter case, at page 727, the following was stated: In general, the worthlessness of stock cannot be properly demonstrated for tax purposes, except in the focus of some identifiable event, as a basis for enabling the time of the actual loss to have become realistically fixed. . A decision to dissolve or liquidate, when a corporation is in fact insolvent, may be sufficient as such an identifiable event, to entitle or to require a taxpayer to claim and establish the worthlessness of the stock during that taxable year. ; ; *86 . There is no doubt that the corporation did in fact pass a resolution to discontinue business and dissolve during a special meeting of its board of directors held on June 20, 1952. Furthermore, the corporation did in fact cease its mining operations at that time, and it immediately commenced to dismantle and dispose of such assets in an orderly manner. By the end of the fiscal tax year before us, the corporation had actually sold much of its machinery and most of its mining equipment was no longer intact. It was not until June of 1952 that the decline in the prices of lead and zinc had destroyed all hope of profitably operating the corporation's leaseholds, and while such hope existed, the corporation's stock was not worthless. . There is also no doubt that the corporation was insolvent at the time the resolution to discontinue business and dissolve was passed by its board of directors on June 20, 1952. The corporation's principal asset, i.e., its lease on the Horn Silver Mine, was valueless, and there existed no market for many of its physical assets. It could not meet *87 current cash requirements, and its liabilities exceeded its assets. In fact, Clemson, who was experienced in this field and entirely familiar with the situation, abandoned all hope of receiving even partial payment on the $83,145.64 debt obligation the corporation owed him at that time. Thus, the record clearly establishes the requisite identifiable event, and we have found that the corporation's preferred stock did in fact become worthless during the taxable year before us. There remains the question of the amount of petitioner's capital loss during such year. This loss is equal to the basis of the corporation's preferred stock in petitioner's hands. If said stock had no ascertainable fair market value at the time it was received in cancellation of petitioner's loans to the partnership, then its cost basis to petitioner is the same as the debt thereby canceled. However, if said stock had a fair market value at that time, then the basis of said stock would be its then fair market value. Arc Realty Co., 48 (June 15, 1960), at page 9; ; and *88 (C.A. 2, 1938). It is clear that the partnership's obligations to petitioner had never become worthless. This mining venture was highly speculative, but in the war and post-war period under consideration its chances for ultimate success were fairly good. Petitioner's advances to it were substantial and made in successive years, including the very year of incorporation. We do not believe petitioner was pouring its money into a bottomless hole. Furthermore Clemson, Otis and Minter loaned partnership well over $200,000 during this same period. The corporation's preferred stock did have intrinsic and potential value in December 1950 at the time of the exchange. The Korean War had stimulated the demand for lead and zinc, and their market price had risen. The Federal Government was entering into contracts that would guarantee the selling price of these metals at a level that would have allowed the corporation to operate at a profit, and the corporation hoped to get such a contract. Clemson accepted 98 of these preferred shares in exchange for a debt of $98,000 at the same time that petitioner received its 814 shares and thereafter Clemson and petitioner had enough faith in the ultimate *89 success of the venture to lend the corporation $83,000 and $180,000 respectively. Nevertheless, it is our conclusion from all the facts of this case that the corporation's preferred stock had no ascertainable fair market value at this time. The nature of the corporation's business was highly speculative; its predecessor partnership had never shown a profit, but the prospects of success were constantly present. There were only 1,000 shares of corporation's preferred stock authorized and the 912 issued shares were all held by petitioner and Clemson, each with a long history of close and generous financial support to the partnership and the corporation. Any potential buyer of such stock would have realized that any rupture of this relationship would dim corporation's chances for ultimate successful operation. There have been no sales of this preferred stock and in our opinion no potential buyers at any realistic price, for its value was so dependent on hopes and intangibles. Leasehold rights and their development comprised over 80 per cent of its balance sheet assets. This element of the instant case is extremely close on its facts to *90 In that case the stock in question was issued by one of the two manufacturers in this country able to make and supply battery equipment for submarines during the first World War. Other facts are made clear by the court's holding: (Pages 781-782) We agree that the stock may have had a fair market value despite the fact that none of it was ever sold. But, though there was adequate proof that the shares had actual value, that does not require a finding that they had a fair market value. . The existence of the latter, or the contrary, depends upon all the relevant circumstances in each instance. Here there were two corporations closely working with each other and the one with whose stock we are now concerned was buoyed up largely by the credit extended to it by the other. Had this business association been broken, the prospects of the Battery Company would certainly have been dimmed. We don't know whether the sale of these shares would have affected such business relationship or not. We do know, however, that the 1915 position of the Battery Company was highly speculative. It had no history of sound financial success. It may be *91 that outside interests would have cared to buy into the corporation by way of these preferred shares but that seems unlikely on this evidence. The fair and sensible conclusion to be drawn from the evidence is so to the contrary and in accord with the finding of the trial judge that the fact of no market value is established by the finding. There was, indeed, here no sound reason for believing that in 1915 the taxpayer was willing to sell or that there was any buyer willing to pay a fair price for the shares. * * * Since these shares did not then have a fair market value, no profit or loss from the standpoint of taxation was realized when they were taken in exchange for the debt in 1915. * * * When they became worthless in 1924, therefore, the loss sustained was the amount of the advances which the taxpayer had cancelled in exchange for the stock. * * * Also cf. , and . It follows that the amount of petitioner's capital loss in fiscal 1952 was $814,000. Decision will be entered for the petitioner. Footnotes
*. California State partnership return.↩
1. Said balance sheet, being subject to revision to reflect all transactions since November 30, 1950, to December 15, 1950, includes the following: ↩
Money borrowed since Dec. 1, 1950 from
Birch Ranch & Oil Co.
$3,600.00
Geo. W. Clemson
2,400.00
$6,000.00
Money disbursed since Dec. 1, 1950, accounts payable, etc.
$6,397.69
2. Respondent does not concede the existence of such notes payable.↩